COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-04-198-CV

 

 

IN THE
INTEREST OF J.M.E.,

K.R.B.R., AND H.L.H., CHILDREN

 

                                                    

                                              ------------

 

             FROM THE 367TH
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








In three points, Appellant T.M.R. appeals from
the termination of her parental rights to the children J.M.E., K.R.B.R., and
H.L.H., contending that the trial court erred in failing to appoint trial
counsel for her at the time of the adversarial hearing.  We agree that the trial court abused its
discretion by not timely appointing trial counsel, but because Appellant has
not proven that the trial court=s
failure to timely appoint counsel harmed her, we affirm the trial court=s
judgment.

After taking Appellant=s
children from her primarily because she used drugs and sold drugs out of her
home in the children=s presence, the Texas Department
of Family and Protective Services (AThe
State@),
represented by a Denton County assistant district attorney, filed a petition to
terminate the parental rights of Appellant and the children=s
fathers on June 10, 2003.  The petition
provided that the State would reasonably try to reunify the children with
Appellant but alternatively requested termination.  Counsel was appointed for the children on
June 12, 2003.  The trial court held the
first adversarial hearing on June 19, 2003. 
Appellant and C.H., H.L.H.=s
father, appeared without counsel.  At the
hearing, the following transpired,

THE COURT:       . . . . 
You are here without an attorney today to represent you, correct?

 

[Appellant]: Yes, ma=am.

 

THE COURT:       Okay. 
But it=s my understanding that
you have reviewed the order which has been presented to the Court and that you
agree to the contents of this order until a further hearing of the Court, is
that correct?

 

[Appellant]: Yes.

 

. . . . 

 

Next, the State=s
attorney questioned Appellant:








Q.     Now, [Appellant], you understand that some of the allegations
that led to the removal of your children involved your drug usage, correct?

 

A.     (Nods.)

 

Q.     Have you used today?

 

A.     No.

 

Q.     And if you were asked to go take a drug test today, would you
come up clean?

 

A.     (Nods.)

 

Q.     When was the last time you used?

 

A.     Prior weekend, on the weekend.

 

Q.     Last weekend?  What did you use?

 

A.     Speed.

 

Q.     Speed? 
Is that it?

 

A.     (Nods.)

 

Q.     How did you use speed?

 

A.     I smoked it.

 

Q.     Okay. 
You injected, also?

 

A.     No.

 

Q.     Never done that?

 

A.     No.

 








Q.     Now, you had an opportunity to read the order that=s been presented to the
Court today, correct?

 

A.     Uh-huh.

 

Q.     You read through all of it, right?

 

A.     He did.

 

Q.     Okay. 
Do you read?  Do you know how to
read?

 

A.     (Nods.)

 

Q.     You don=t, okay. 
Did someone read it to you?

 

A.     (Nods.)

 

Q.     Did he read it to you?

 

. . .
. 

 

[C.H.]:       I will explain it to her later.

 

. . .
.

 

Q.     [State]:      Okay.  So you weren=t able to read it
yourself, but you=re saying that he C

 

A.     He=s read it to me.

 

Q.     And who is he?

 

A.     [C.H.].

 

Q.     Okay. 
[C.H].  And you=re saying [C.H.] read it
to you?

 

A.     Yeah, he read it for me.

 

Q.     Okay. 
Do you feel like you understand what=s in that order?








A.     Yeah.

 

Q.     Are you sure?

 

A.     Yeah.

 

Q.     Okay.  Because we can take
time to go through it with you if you don=t.

 

A.     No.

 

Q.     You feel comfortable with what you signed,
correct?

 

A.     Yeah.

 

Q.     Do you understand that in order to get your children back, you=re going to have to
participate in a number of services?

 

A.     Yeah.

 

Q.     And do you feel like you understand what
those services are?

 

A.     Yeah.

 

Q.     Okay.  You understand that
you=re going to have to
participate in a psychological evaluation, some drug assessments, and
counseling, and things like that, right?

 

A.     Yeah.

 

Q.     You=re willing to do that?

 

A.     Yes.

 

Q.     Do you understand that if you don=t do that that you=re not going to C

 

A.     I lose my rights.

 








Q.     Cprobably get your kids back,
you understand that?

 

A.     Yeah.

 

Q.     Okay.  Do you also
understand that you have the opportunity to have a hearing today to determine
whether CPS should keep your kids or whether they should go home to you.

 

[C.H.]:  No, we didn=t know that?

 

A.     No, we did not know that.

 

Q.     [State]:      What did you
think your options were as far as this hearing today?

 

A.     Just a temporary C where they would be temporary, stay where they=re at.

 

Q.     Okay.  Nobody told you you
had to sign that paper, right?  That was
your choice?

 

A.     They told us we needed to sign this or that we can have a
complete hearing.

 

Q.     Okay.  Or you can either
sign it and agree to it, or you can have a hearing, right?

 

A.     (Nods.)

 

Q.     Okay.  And the point of
the hearing is for y=all to present whatever
evidence you have that the kids should go home with you, and CPS would present
whatever evidence that they have that the kids should stay with CPS.  Do you understand that?

 

A.     No.

 

Q.     You don=t understand that?  Okay. 
Would you like to have a hearing?

 








A.     I=d like to have my kids.

 

Q.     Okay.  Well, they=re C

 

A.     It=s not funny.

 

Q.     Do you feel C well, I=m not laughing at you.  I=m just trying to figure out how to C what to do with this
situation here.  Do you feel like you
understood what you signed, and that by signing that paper, that CPS hangs onto
your children for right now?  Do you
understand that?

 

A.     Yeah.

 

Q.     And is that what you want to do?

 

A.     No, I want my kids with me.

 

Next, the children=s attorney ad litem
questioned Appellant:

 

Q.     . . . .  I=m just trying to get to
the level of what your problem is.

 

A.     My problem is not having my kids.

 

. . . .

 

Q.     . . . .  Do you think
perhaps . . . that it might be best . . . that you get some help for your drug
problem before your children are returned to you, best for them, maybe?

 

A.     I=ll get the help.

 

Q.     Pardon me?

 

A.     I=ll get the help, but I=d like to see my kids.

 

Q.     Well, one of [the] things C

 








A.     Not tell me when I get to see them and how long I get to see
them.

 

. . . . 

 

Q.     Okay.  Do you think right
now as you stand here today it would be safe to return the children to your
care, given you haven=t had any kind of help
with your drug problem?

 

A.     If you=re saying if I can take
care of my kids or not, yes, I can take care of them, and no, I won=t put them in any way
they can get hurt.  If y=all won=t put them with me, put
them with a family member; put them where they know somebody.

 

. . . . 

 

Q.     When you went through the orders, the order you signed and
agreed to, Terry Ochoa from Child Protective Services, she read through that
order with you, as well, did she not?

 

A.     Yes.

 

Q.     And did you understand it?

 

A.     No.

 

Next, the trial judge
asked Appellant some questions.

 

THE
COURT:  Ma'am, let me ask you some
questions.

 

You do not have an attorney to represent you, and I assume that you do
not intend to hire an attorney to represent you; is that correct?

 

[Appellant]:  I think I might need one.

 

THE COURT:  Okay. 
I'm going to agree with you there. 
But at this point in time my question is:  Do you intend to hire an attorney to
represent you?








[Appellant]:  I don't have the money.

 

THE COURT:  Okay. 
And C

 

[Appellant]:  Can I get a court-appointed one?

 

THE COURT:  Is the State's position that the State is
going to pursue termination or reunification at this time?

 

[State]:  At this time, Your Honor, the State is
seeking a reunification and not termination.

 

THE COURT:  Ma'am it's only if the State is seeking
termination of your parental rights that you're entitled to a court-appointed
attorney if you're indigent.  They're
telling the Court that they're not seeking termination of your rights; they're
trying to find a plan which will allow your children to come home to you to a
safe environment, and it=s their position CI haven=t made any finding yet,
but it=s their position that
that can=t occur now.

 

You are entitled to a full hearing before the Court to present your
evidence and your position that the children should be returned to you, but if
you do that and you represent yourself, you have to follow the same rules that
the attorneys do, you know.  And if you
don=t know those rules, it
may be difficult for you to represent yourself. 
Do you understand that?

 

[Appellant]: Uh-huh.

 

THE COURT:       Okay. 
And if at any time you don=t understand what I=m saying to you, I want
you to tell me you don=t understand; no one=s going to get mad at
you, you=re not going to get in
trouble.  I just need to know that you
understand.

 

Are you telling me that you do not wish to agree to this order and
that you want to have a hearing on these issues?

 

[Appellant]: Can he help me?

 








THE COURT:       I mean, he=s a separate party in
here.  If you want to take a few minutes
and talk, I=ll give you an
opportunity.  I=ll take a recess and give
y=all a few minutes to
talk.  We don=t need to be doing that
on the record.  If you=re going to be giving her
advice, you need to go do that in private.

 

[C.H.]:       I was just going to try and explain to
her what exactly is going on.  Let us
take that recess, all right?

 

THE COURT:       Y=all come back in about five minutes and let=s try to figure out where
we=re going.

 

. . . .

 

THE COURT:       . . . . 
Okay. [Appellant], I was speaking to you before we took a recess, and
you had an opportunity to discuss this matter with [C.H.] over that recess,
correct?

 

[Appellant]: Yes, ma=am.

 

THE COURT:       Okay. 
And my question to you is: Do you wish to proceed with the agreed order
which has been presented to the Court today and agree to the contents of that
order until a further hearing, or do you wish to have a hearing at which time
you can present whatever evidence or testimony that you wish to present
concerning whether the children should be returned to you?

 

[Appellant]: I agree with the CPS.

 

. . . . 

 

The State=s attorney then
questioned Appellant again:

 

Q.     [Appellant], I told you out there in the hall just now that if
you signed off on the order, then you agreed that CPS will keep you kids,
meaning you wouldn=t get them back today,
right?

 

A.     Yes.

 








Q.     And I told you that if you had a hearing that there was a chance
that you might get them back today?

 

A.     Yes, ma=am.

 

Q.     And you understand that, right?

 

A.     Yes, ma=am.

 

Q.     And you voluntarily agree that CPS keeps your kids for now?

 

A.     Yes, ma=am.

 

Q.     Okay.  Now, [the children=s attorney] spoke with
you and asked you some questions about drug usage and drug problems and stuff
like that, and, in fact, you were also selling drugs, correct?

 

A.     Yes, ma=am.

 

The testimony shows that Appellant requested
appointed trial counsel because she could not afford it and that the trial
court denied her request.  We therefore
reject the State=s arguments that Appellant has
somehow failed to preserve this issue for appeal or that the rendition of the
order of termination moots Appellant=s
issues.[2]








The testimony also shows that Appellant could not
read and that she had to rely on the State=s
lawyer, the children=s lawyer, and C.H. to explain
the pleadings and proposed orders to her. 
There is no evidence that C.H., who was also facing termination of his
parental rights, is a lawyer.  There is
no evidence that the court had any knowledge of his educational level,
intelligence level, or reading level at the time of the hearing, although a
psychologist testified at the final trial almost a year later that C.H. had
average intelligence and that he read at the level of someone with a high
school education.  The same psychologist
also testified that Appellant read on a third-grade level.  The testimony at the adversarial hearing does
not show that anyone warned Appellant about her rights not to incriminate
herself either before or during the hearing. 
What the evidence does show is that the trial court presented Appellant
with the Hobson=s choice of agreeing to an order
that she could not read or representing herself in a battle governed by rules
that she did not know and probably could not comprehend.

The order from the hearing contains this section:

4.     Appointment of Counsel for Parents or Parties

 

The Court defers its
finding regarding an attorney ad litem for [Appellant], because she has
not appeared in opposition to this suit or has not established indigency.

 













To the extent that the trial court found that
Appellant did not appear in opposition to this suit, the trial court erred.[3]  To the extent that the trial court found that
Appellant did not establish indigence, we note that Appellant said that she
could not afford an attorney and that she wanted a court-appointed
attorney.  The affidavit in support of
the State's petition provided that she lived in a trailer and was
unemployed.  Rather than advising her to
file the proper documents or following up with questions about her indigence,
the trial court denied her request out of hand because the State=s
attorney orally advised that the State was not seeking termination at that
time.  The State=s
petition, like many we see in termination cases, requested reunification or,
alternatively, termination.  We note that
the State never amended its petition to drop its termination request.  Further, we hold that Appellant took every
step available to her at that point to establish indigence and request
appointed counsel.  The only evidence
before the court on the issue pointed to Appellant's indigence.  No evidence supported a finding that
Appellant had not established indigence. Consequently, we hold that the trial
court abused its discretion to the extent that it found that Appellant did not
establish indigence.[4]  We therefore further hold that the trial
court erred by denying counsel at that time.[5]

To obtain reversal of the order of termination,
however, Appellant must show that the trial court=s
failure to timely appoint counsel probably caused the rendition of an improper
judgment or probably prevented her from properly presenting the case to this
court.[6]  Under the circumstances in this particular
case, Appellant has not met this burden.








At some point after the adversarial hearing,
Appellant submitted an undated affidavit of indigence.  Trial counsel was appointed in November 2003,
six months before trial but after several hearings and a lot of CPS interaction
with Appellant.  After the trial, the
trial court found that Appellant had knowingly placed or knowingly allowed the
children to remain in an environment which endangered the children=s
well-being; had knowingly engaged in conduct or knowingly placed the children
with persons who engaged in conduct which endangered the children=s well-being;
had failed to comply with the provisions of a court order that specifically
established the actions necessary for her to regain custody of the children;
and had used a controlled substance in a manner that endangered the children as
well as (1) failed to complete court-ordered substance abuse treatment or (2)
continued abuse of a controlled substance after completing treatment.[7]  The trial court also found that termination
was in the children=s best interest.[8]








Appellant complains that counsel was appointed
too late to do her any good and that the absence of counsel during the critical
approximately five-month period after the petition was filed harmed her because
she had no one to advise her about her dealings with the State.  But the record shows that even after she
received appointed counsel, Appellant=s
behavior did not improve.  She got out of
jail about two weeks before she received appointed counsel on November 20, but
on December 15, she went back to jail for three months on a charge of engaging
in organized criminal activity, a charge that apparently remained pending at
the time of trial.  She continued to test
positive on drug tests, testing positive during the week before trial.  She admitted at trial that she continued to
use drugs, but she stated that she had cut back a lot and was no longer using
every day.  She did not get a job until
the month before trial.  She still did
not have a place to live.  Appellant does
not complain about her trial counsel=s
performance.

Based on Appellant=s
conduct justifying the removal as well as her conduct after trial counsel was
appointed, we cannot say that the delay in the appointment of counsel in this
case caused or even contributed to the order of termination or limited the
presentation of Appellant=s case on appeal.[9]  We therefore hold that Appellant has failed
to show that the trial court=s delay
in appointing her trial counsel harmed her. 
Because Appellant has not proven harm, we must overrule her three points
and affirm the trial court=s order
of termination.

 

LEE
ANN DAUPHINOT

JUSTICE

 

PANEL A:   LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

LIVINGSTON, J. concurs without opinion. 

DELIVERED:  November 17, 2005











[1]See Tex. R. App. P. 47.4.





[2]See Tex. R. App. P. 33.1(a) (regarding
preservation of error); Merrill Lynch, Pierce, Fenner & Smith, Inc. v.
Hughes, 827 S.W.2d 859, 859 (Tex. 1992) (regarding mootness).





[3]See In re C.D.S., 172 S.W.3d 179, 184 (Tex. App.CFort Worth 2005, no pet.) (rejecting State=s
argument that mother who testified at adversary hearing that she wanted her
child back did not appear in opposition).





[4]See Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002); Simon v.
York Crane & Rigging Co., 739 S.W.2d 793, 795 (Tex. 1987); In re
M.N.G., 147 S.W.3d 521, 530 (Tex. App.CFort Worth 2004, pet. denied).





[5]See Tex. Fam. Code Ann. ' 107.013(a)(1) (Vernon Supp. 2005) (providing that
when the State files a petition for termination, the court shall appoint an
attorney ad litem to represent the interests of an indigent parent of the child
who responds in opposition to the termination).





[6]See Tex. R. App. P. 44.1(a); Beam v.
A.H. Chaney, Inc., 56 S.W.3d 920, 924 (Tex. App.CFort
Worth 2001, pet. denied).





[7]See Tex. Fam. Code Ann. '
161.001(1)(D), (E), (O), (P) (Vernon Supp. 2005).





[8]Id. '
161.001(2).





[9]See Tex. R. App. P. 44.1(a).